Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiffs*

## IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Ali Jiha, Daniel Jiha, and Libnan Jiha, | Case No. 4:25-cv-00051 |
| Plaintiffs, | |
| v. | **FIRST AMENDED COMPLAINT** |
| Pam Bondi, in her official capacity as Attorney General; Kash Patel, in his official capacity as Director of the Federal Bureau of Investigation; Kristi Noem, in her official capacity as Secretary of Homeland Security; | |
| Defendants. | |

# BACKGROUND

1. Plaintiffs are three members of the Jiha family: Ali Jiha and his two adult sons, Daniel Jiha and Libnan Jiha. All are U.S. citizens who experienced no significant challenges traveling internationally prior to 2023. Beginning in approximately March 2023, in separate events, father and sons have been subjected to arbitrary and unreasonable detention, questioning, and unexplained delays while traveling internationally by air and by land.

2. In the most extreme examples, Ali was detained for approximately eight hours at a land port of entry with Mexico in March 2023 while seeking admission to the U.S., Daniel was detained for approximately four hours at a land port of entry with Mexico in September 2024 while seeking admission to the U.S., and Libnan was detained for approximately one hour in the international terminal of O'Hare Airport upon returning from an international trip in July 2024.

3. During this time period, every instance of international travel has been accompanied by unexplained delay during interactions with airline personnel, TSA airport personnel, CBP airport personnel, and CBP land port personnel.

4. The government's treatment toward the Jiha family is not because the government has probable cause to believe that any member of the family has committed a crime. Instead, the government's actions are on account of them being placed on a 9/11-era, terrorism-related government watchlist. Specifically, the Jiha family believes that each

of them has been placed on a watchlist known as the Selectee List. *See, e.g.,* 49 U.S.C. § 44903 (referring to an "automatic selectee list").

5. Despite numerous efforts to gain clarity during the past two years, the federal government has refused to explain to Ali Jiha why his name appears on the selectee list and has not provided him a meaningful opportunity to correct or challenge whatever error led to this placement on it. At most, the government simply stated that it can "neither confirm nor deny" Ali's presence on a watchlist and indicated that, if Ali is on such a list, the government "made any corrections" that it determined "necessary" to avoid "incidents of misidentification." Even after this vague communication from the government, Ali and his sons continue to experience untenable difficulties whenever they travel internationally. Similarly, Ali's two adult sons have been unable to get answers.

6. Through this action for declaratory and injunctive relief, Plaintiffs seek the removal of their names from the so-called Selectee List, or any other government watchlist resulting in prolonged detention during international travel. In addition to challenging their inclusion on the list itself, Plaintiffs challenge the sufficiency of the government's existing procedures for contesting their inclusion on such list(s).

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a), as the cases' claims arise under the federal constitution and federal statute.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

8. The Court may grant injunctive relief under the Administrative Procedures Act, 5 U.S.C. § 702, which entitles the plaintiff to judicial review of an agency decision and waives sovereign immunity of the United States with respect to any action seeking injunctive relief under 28 U.S.C. § 1331.

9. The Court may also grant declaratory relief pursuant to the Declaratory Judgement Act, 28 U.S.C. § 2201 and § 2202, and under Fed. R. Civ. P. 56 and Fed. R. Civ. P. 57 and 65.

10. Venue is proper under 28 U.S.C. § 1391(e) in the District of Arizona because several officers or employees of the United States are defendants in their official capacity, a substantial part of the events or omissions giving rise to the claim occurred in Pima and Santa Cruz Counties (located within the District of Arizona), and at least one of the Plaintiffs resides in Pima County.

**PARTIES**

**Plaintiffs**

11. Plaintiff Ali Jiha (hereafter "Ali") is a naturalized U.S citizen and resident of Tucson, Arizona.

12. Ali first traveled to the United States as a college student on a student visa, and his ties and devotion to the United States have grown stronger ever since that time.

13. Ali was born in Lebanon and obtained his lawful permanent residency status (hereafter "LPR" status) in 1986 at the age of 21.

14. In 1996, Ali naturalized as a U.S. citizen.

4

15. Since 1996, Ali has held dual citizenship status with the United States and Lebanon.

16. At all relevant times, Ali has been a full-time resident of Arizona and a small business owner in Arizona, where he employs several local workers.

17. Plaintiff Daniel Jiha (hereafter "Daniel") is a U.S. citizen born in Arizona.

18. Daniel is a recent college graduate and resident of Tucson, Arizona.

19. Plaintiff Libnan Jiha (hereafter "Libnan") is a U.S. citizen born in Arizona.

20. Libnan works in the local family business with his father in Tucson.

21. Daniel and Libnan are the adult sons of Ali.

### Defendants

22. Defendant Pam Bondi is the Attorney General of the United States. As the Attorney General, Defendant Bondi oversees the Justice Department, which has authority over the Federal Bureau of Investigation (hereafter "FBI"). The FBI, in turn, administers the Terrorist Screening Center, which consolidates the federal government's counter-terrorism related operations, including the Terrorist Screening Database. Defendant Bondi is sued in her official capacity.

23. Defendant Kash Patel is the Director of the Federal Bureau of Investigation, which administers and oversees the Terrorist Screening Center. Defendant Patel is sued in his official capacity.

24. Defendant Kristi Noem, the Secretary of United States Department of Homeland Security and holds authority over U.S. Customs and Border Protection, which oversees

5

and administers all land ports connecting the United States with Mexico. Defendant Noem is sued in her official capacity.

## FACTUAL ALLEGATIONS

### The Terrorist Screening Center and Government Watchlists

25. The Terrorist Screening Center (hereafter "TSC") was created by presidential directive, and began operating in December 2003.[1]

26. The TSC is administered by the Federal Bureau of Investigation (FBI).[2]

27. The United States' government maintains multiple streams of information repositories in its effort to track individuals and groups associated with terrorism. The United States maintains The Terrorist Identities Datamart Environment (hereafter "TIDE"), which is the "US Government's central repository of information on international terrorist identities."[3] TIDE, acting as the 'central repository' feeds into a consolidated database.

28. That consolidated database has been known by many names over the years. It is sometimes referred to as the "terrorist watchlist", the "terrorist screening dataset", and the "terrorist screening database." *See, e.g., Kovac v. Wray*, 109 F.4th 331, 336 (5th Cir. 2024) (summarizing the various names for the database). In this action, the dataset is referred to by its common acronym, "TSDB" – terrorist screening database.[4]

---

[1] Department of Justice (2005) Terrorist Screening Center, National Archives. Available at: https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-justice/rg-0065/n1-065-06-002_sf115.pdf (Accessed: 25 November 2024).

[2] Id.

[3] https://www.dni.gov/files/NCTC/documents/features_documents/TIDEfactsheet10FEB2017.pdf

[4] Id.

29. The TSC maintains the TSDB.[5] The TSDB "includes biographic identifiers for those known to have or those suspected of having ties to terrorism."[6]

30. The TSDB contains two sub-lists: 1) the No-Fly List, which automatically excludes individuals from flying on commercial flights traveling in U.S. airspace; and (2) the Selectee List, which contains individuals who are subject to "additional security screening" before they may be permitted to board an airplane or permitted to enter the U.S. at land ports.[7]

31. Colloquially, the 'No Fly List' is used interchangeably with the 'terrorist watchlist.' However, a person whose name appears in the TSDB may be placed in either the 'No Fly List' or the 'Selectee List.' Each list is accompanied by distinct restrictions and levels of enhanced screening. For example, while the 'No Fly List' is more intrusive and restrictive than the 'Selectee List' as it applies to air travelers, the 'Selectee List' is believed to apply more expansively on account of its imposition of burdens on those traveling by land <u>and</u> air.

32. Under applicable regulations, an individual can be included on these two particular watchlists only if the TSC possesses a minimum number of so-called "derogatory"

---

[5] STATEMENT OF CHRISTOPHER M. PIEHOTA Department of Justice (2014), https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/2015/06/01/09-18-14_fbi_piehota_testimony_re_safeguarding_privacy_and_civil_liberties_while_keeping_our_skies_safe.pdf

[6] Congressional Research Services, The Terrorist Screening Database: Background Information Congressional Research Reports (2016), https://crsreports.congress.gov/product/pdf/R/R44529/7#:~:text=The%20TSC%20was%20created%20by,not%20necessarily%20shared%20or%20compared. (last visited Nov 25, 2024).

[7] Federal Bureau of Investigation, Overview of the U.S. government's terrorist watchlisting process and procedures FBI (2024), https://www.fbi.gov/file-repository/terrorist-watchlisting-transparency-document-april-2024-050224.pdf/view (last visited Nov 25, 2024).

pieces of information associated with that individual. But, because so much of the process is confidential, the precise criteria for inclusion on either the 'No Fly List' or the 'Selectee List' is unknown to the general public (including Plaintiffs).

33. Upon information and belief, Plaintiffs are currently on the Selectee List.

34. In addition to additional screening, inclusion on the Selectee List carries a government imprimatur of criminality: it signifies that the U.S. government suspects the individual of being a terrorist.

35. An individual appears on the Selectee List following "nomination" by one of several federal agencies with authority to nominate. While the term "nominate" is typically associated with an award, prize, or accolade, the term in this context described the first step that typically leads to negative outcomes for the person nominated.

36. The exact criteria that qualifies an individual for admission into the TSDB is not publicly available, however, an individual is admitted into the TSDB "when there is 'reasonable suspicion' that he or she is a known or suspected terrorist."[8]

37. The purpose of the TSDB is to allows agencies —specifically the TSA and CBP—to conduct heightened screenings of individuals in airports and ports of entry.[9]

---

[8] Kashem v. Barr, 941 F.3d 358, 365 (9th Cir. 2019); STATEMENT OF CHRISTOPHER M. PIEHOTA Department of Justice (2014), https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/2015/06/01/09-18-14_fbi_piehota_testimony_re_safeguarding_privacy_and_civil_liberties_while_keeping_our_skies_safe.pdf

[9] STATEMENT OF CHRISTOPHER M. PIEHOTA Department of Justice (2014), https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/2015/06/01/09-18-14_fbi_piehota_testimony_re_safeguarding_privacy_and_civil_liberties_while_keeping_our_skies_safe.pdf

38. Even though this information is effectuated by the 'front-line agencies' i.e., the TSA and CBP, it is the TSC that controls and administratively modulates its submissions and distribution.[10] In other words, the final decision is made by the TSC.

### DHS TRIP Redress Procedures

39. In 2007, the U.S. government launched a system for a traveler to lodge a grievance when the traveler's past experiences suggest to him possible inclusion on a government watchlist.

40. This system is referred to as TRIP – the Traveler Redress Inquiry Program (hereafter referred to as "TRIP"). TRIP is housed within, and operated by, the Department of Homeland Security.

41. An individual who seeks to challenge placement (or suspected placement) on a watchlist may submit a standard TRIP form. Upon information and belief, the completed form is received by DHS. Thereafter, DHS transmits the completed form to TSC, which is a part of the FBI. The FBI, in turn, is housed within the U.S. Department of Justice. TSC makes all final determinations about whether an individual is to remain on a watchlist or whether any modifications are necessary.

42. Although TRIP is housed with DHS, all final decisions regarding grievances received through the TRIPS program is a decision of the U.S. Department of Justice (through the FBI's TSC).

---

[10] Id.

43. The U.S. Government's Transportation Security Administration ("TSA") has no role in rendering a determination on a grievance received through the TRIPS program.

### Plaintiff Ali Jiha's Challenges During International Travel

44. Prior to March 2023, Ali was able to travel internationally without burden. From 2008 to 2014, for example, Ali regularly traveled, by land, between Mexico and Tucson. During this same time period, Ali also traveled to Spain and Lebanon without incident. During frequent international trips by land and air, Ali never experienced prolonged detention when seeking re-admission to the United States and only occasionally was subjected to relatively brief questioning of no more than 30 minutes.

45. Beginning in March of 2023, Ali has faced irregular and excessive restricted travel conditions including repetitive detentions, secondary screenings, interrogations, missed flights, and varied levels of reasonings from travel staff.

46. Ali first experienced a prolonged detention at a land port of entry in March 2023.

47. On March 17, 2023, Ali had a dental appointment in Nogales, Mexico – approximately 60 miles from his Tucson home. On that date, Ali drove to Mexico, crossing the international border in the marked lanes of the DeConcini Port of Entry that connects Nogales, Arizona and Nogales, Sonora (Mexico). Ali drove a properly licensed vehicle that was registered to his name.

48. Following his dental appointment, Ali remained overnight in Mexico and returned to the United States on March 18, 2023.

49. Upon seeking re-entry into the United States on March 18, 2023, Ali drove the same vehicle in which he traveled southbound across the international border the previous day.

50. Upon seeking re-entry into the United States on March 18, 2023, neither Ali nor his vehicle had any belongings that might trigger heightened concern or suspicion under U.S. law. For example, Ali did not carry U.S. currency exceeding $9,999, did not carry agricultural products, did not carry narcotics (prescription or otherwise), did not carry animals, and had no vehicle passengers traveling with him.

51. Upon seeking re-entry into the United States on March 18, 2023, Ali carried an unexpired, valid United States passport that conclusively established his entitlement to gain admission to the United States.

52. Nevertheless, upon driving his vehicle onto U.S. territory within the confines of the DeConcini Port of Entry, a uniformed CBP agent instructed him to exit his vehicle, to leave the keys in the vehicle, and to surrender his U.S. passport.

53. Upon exiting the driver's side of his vehicle, Ali was immediately placed in handcuffs in front of the other motorists who were also waiting to gain admission to the U.S.

54. Ali calmly asked CBP agents to explain to him the reason(s) for his being detained. No answer was given.

55. Still handcuffed, Ali was escorted into a processing room located within the DeConcini Port of Entry. The room resembled a holding cell that one might expect to find at a police station or county jail.

56. Ali was not permitted to have his cell phone and was not permitted to contact any loved ones.

57. Upon being escorted to the processing room, CBP agents removed the handcuffs from one of Ali's wrists and attached the handcuff to a metal bench located in the processing room. The result was that Ali was now handcuffed to the bench.

58. Ali remained shackled to the bench for approximately three hours, without any explanation.

59. After about three hours, Ali was unshackled from the bench and was questioned extensively by a CBP agent about his professional life, his hobbies, his prior relationships, and about the naturalization process that he had undergone nearly 30 years earlier.

60. During the interrogation, government agents failed to explain why Ali was being detained.

61. During the interrogation, a CBP agent gave Ali a friendly suggestion: to stop traveling to Mexico in order to avoid future inconvenience. Ali informed the CBP officer that he must return to Mexico for a follow-up dental appointment, and the CBP agent indicated that there was no way they could ensure a smooth return to the United States in the event he chose to attend his follow-up dental appointment in Mexico.

62. At the conclusion of the interrogation, Ali was placed in a different holding room, without handcuffs, where he was detained for an additional 2.5 hours.

63. During this time, Ali was denied access to his cellular device and was unable to communicate with family or loved ones. That particular day was payday within the company owned and operated by Ali. Consequently, several employees were expecting to be paid that day, but were not able to be paid on schedule because Ali had been detained for the majority of the workday and unable to access his electronic devices for the purpose of running payroll.

64. While being detained in the processing room, Ali's vehicle was thoroughly stripped down and searched.

65. In total, Ali was detained for approximately 8 hours at the DeConcini Port of Entry on March 18, 2023.

66. On March 30, 2023, Ali returned to Mexico for his previously-scheduled follow-up dental appointment. This time, Ali traveled on foot, in the hopes of avoiding unnecessary burdens upon re-entering the U.S.

67. Upon seeking re-admission to the U.S. through the DeConcini Port of Entry, Ali was detained in a processing room and again handcuffed.

68. On March 30, 2023, Ali was detained at the port of entry for a total of approximately 45 minutes before being re-admitted to the U.S.

69. During this second experience on March 30, Ali was traveling on foot with a friend. The friend observed Ali being detained by CBP agents. Ali was humiliated and embarrassed in front of his friend.

70. Ali remained respectful and cooperative during both the March 18, 2023 and March 30, 2023 encounters at the DeConcini Port of Entry.

71. Following these experiences at the land port, Ali submitted several complaints to the U.S. Government. These included submitting a grievance to DHS's TRIP system (described above) and submitting a complaint to DHS's Office for Civil Rights and Civil Liberties ("CRCL").

72. On April 10, 2023, the DHS CRCL responded to Jiha asserting that they have "recorded it in our database" and that the "CRCL will take no further action on the information you provided at this time." It would be several more months before Ali would receive a response from DHS TRIP.

73. On April 19, 2023, Ali arrived 3 hours early to the Tucson International Airport in preparation for a flight to Lebanon to visit his family.

74. At the ticketing counter, Ali waited for more than one hour because, as he was informed, ticketing agents had to "obtain clearance from the main office." Ali was told that this was necessary in order to "clear his name." This was the first time that Ali had ever heard this expressed by a ticketing agent while awaiting departure.

75. After one hour, Ali was finally issued his boarding passes. Different from Ali's previous experiences, his boarding pass bore a unique identifier: the handwritten letters "SSSS."

76. Ali later learned that the letters "SSSS" signal to TSA officials that the traveler must be subjected to specialized security screening. Indeed, there is now a well-documented

14

correlation between these letters and a traveler's almost certain fate upon arriving at the TSA security checkpoint.

77. On April 19, 2023, upon arriving at the TSA security checkpoint at Tucson International Airport, Ali was flagged for security screening and subjected to an extensive search. In fact, Ali overheard one of the TSA agents mention that they had not needed to conduct a search of such magnitude in quite some time.

78. Ali remained respectful and cooperative throughout the April 19, 2023 ordeal.

79. On December 5, 2023, after Ali returned to the U.S. from his Lebanon trip, he received a written response to his earlier grievance submitted to DHS TRIP. In relevant part, the TRIP program stated that it "can neither confirm nor deny" that Ali's name appears on any watchlists. The letter went on to say that the government had "made any corrections to records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification." Further, the letter cautioned that, "[d]espite these positive efforts, we cannot ensure your travel will be delay-free."

80. Although the response letter came from DHS TRIP, the determination and the underlying intelligence analysis was conducted by the TSC (housed within the FBI).

81. Despite DHS TRIP's response, Ali continued to be detained and experience other severe burdens while traveling internationally.

82. For example, on November 4, 2024, Ali arrived at Tucson International Airport where he was boarding a domestic flight to Dallas, with a final destination of Spain.

83. Ali was delayed, once more, at the ticketing counter and told that his name needed to be cleared. This took more than one hour. After receiving his boarding passes, Ali was patted down, swabbed, and questioned. This process took approximately an additional hour. By the time Ali cleared through the TSA checkpoint, the plane had already finished boarding. Ali was charged a $300 late fee by Qatar Airlines and forced to make a new reservation for a different series of flights departing Tucson the following day, November 5.

84. The re-arranged flight took Ali from Tucson to Chicago, then from Chicago on to his final destination of Spain.

85. In anticipation of further complications, Ali returned to the Tucson International Airport several hours before his flight's scheduled departure on November 5, 2024. At the ticketing counter, Ali again tolerated another delay of more than one hour at the airport's ticketing counter.

86. After Ali was granted his boarding pass (again with the handwritten "SSSS"), Ali was again searched, swabbed, and questioned for more than one hour at the TSA security checkpoint.

87. At the gate, Ali was again asked to step aside before boarding the aircraft. In front of other boarding passengers, Ali was again swabbed. Presumably, officials were searching for evidence of explosives or bomb residue.

88. At Chicago's O'Hare Airport on November 5, 2024, Ali was told that his boarding pass, issued to him at the Tucson Airport, was "deemed invalid." This required him to re-visit the ticketing area within the O'Hare Airport.

89. Airline staff at O'Hare Airport informed Ali that security officials in Spain had an issue with Ali's passport. Airline personnel questioned Ali about whether his passport was stolen, lost, or revoked.

90. This process was so prolonged that airline officials closed the gate. Ali was able to board the flight only after advocating for himself with airline staff.

91. Once in Spain, Ali had no issues going through security or customs. When Ali asked Spanish officials within the Spanish airport whether their government had concerns regarding Ali's passport, the response was no. The Spaniards had no concern with Ali's U.S. passport.

**Plaintiff Daniel Jiha's Challenges During International Travel**

92. Upon information and belief, Daniel has faced heightened security screenings, interrogations, and prolonged detentions when traveling internationally on account of being placed on the government's Selectee List.

93. Upon information and belief, Daniel was placed on the Selectee List due to his familial relationship to his father, Plaintiff Ali Jiha.

94. Daniel believes that his circumstance is tied to that of his father, in part, because Daniel began to experience difficulties only <u>after</u> March 2023 – when Ali himself first experienced his 8-hour detention at the DeConcini Port of Entry.

95. On July 26, 2024, Daniel was flying back from Madrid. After arriving to the international terminal of JFK Airport the following day, July 27, Daniel was scheduled to continue on to his final destination in Arizona.

96. After arriving to JFK Airport, however, Daniel's boarding pass was marked with the telltale "SSSS." Predictably, Daniel was subject to extra questioning and screening, lasting approximately two hours.

97. During the extended screening, a CBP agent ushered Daniel into a private room away from other travelers. A CBP agent then confiscated Daniel's mobile device, asked Daniel to unlock his device, and instructed Daniel to leave the room while his device was manually searched.

98. As a result of this lengthy investigation, Daniel missed his domestic flight from JFK to Tucson and had to spend a night in New York City.

99. The following day, while attempting to board his rescheduled flight from JFK to Tucson, Daniel was again required to undergo extra TSA screening.

100. On another occasion, on September 6, 2024, Daniel was traveling through the DeConcini Port of Entry in Nogales, Arizona. This was Daniel's first time crossing an international land border since March 2023, when Daniel's father had been detained for eight hours.

101.     CBP agents pulled Daniel into an isolated interrogation room within the DeConcini Port of Entry, where he remained for four hours.

102.     Similar to his father's experience at the same location 18 months earlier, Daniel was forced to wait in the secluded room for several hours before being subjected to a series of questions.

103.     While waiting in the interrogation room within the DeConcini Port of Entry, Daniel asked CBP agents for permission to use the restroom. Agents permitted Daniel to use the restroom only in the presence of an agent who monitored him throughout.

104.     Most recently, Daniel returned to the United States – through the Los Angeles International Airport – after a weeklong vacation in Spain.

105.     After landing in Los Angeles and proceeding toward the customs area of the international terminal, Daniel was recognized by a federal agent. The agent approached Daniel without asking for his name or identity, called his name with an air of confidence, and pulled him aside for questioning.

106.     The federal employee spoke as if she knew Daniel personally. For example, she remarked that Daniel "spoke good Spanish," despite the fact that their conversation was conducted entirely in English and despite the fact that Daniel had not spoken in Spanish since arriving to the airport. Daniel did not recognize the federal agent and does not believe that he had previously met her.

107.     The above incident suggests that the federal agent had reviewed a confidential computer file before approaching Daniel in the terminal. Upon information and belief,

the federal agent who approached Daniel reviewed information contained in the TSDB.

**Plaintiff Libnan Jiha's Challenges During International Travel**

108.    Upon information and belief, Libnan has faced heightened security screenings, interrogations, and prolonged detentions when traveling internationally on account of being placed on the government's Selectee List.

109.    Upon information and belief, Libnan was placed on the Selectee List due to his familial relationship to his father, Plaintiff Ali Jiha.

110.    Libnan believes that his circumstance is tied to that of his father, in part, because Libnan began to experience difficulties only <u>after</u> March 2023 – when Ali himself first experienced his 8-hour detention at the DeConcini Port of Entry.

111.    As a teenager, Libnan was diagnosed with epilepsy, a condition that places him at high risk of suffering seizures. Seizures can occur at any time without warning, and they have been medically shown to be triggered by heightened stress.

112.    On July 2, 2023, Libnan traveled for the first time on an international flight since his father, Plaintiff Ali Jiha, experienced the 8-hour detention at the DeConcini Port of Entry.

113.    On that date, Libnan boarded a plane in Lebanon, headed for Jordan. There were no complications associated with that flight. In Jordan, Libnan boarded his connecting flight headed for Chicago's O'Hare International Airport.

114. Upon arriving to O'Hare, Libnan proceeded to CBP customs area within the international terminal. This is where he first experienced undue inspection and questioning. Libnan was escorted to a secondary inspection area within the international terminal.

115. A CBP agent explained to Libnan that they merely wanted to "make sure you're safe." This comment perplexed Libnan, as he had expressed no concerns and displayed no signs of distress.

116. The CBP agent then questioned Libnan about whether he had served in the military in Lebanon.

117. Libnan also encountered multiple lines of questioning in regard to his father and his father's travels and business.

118. Just as had occurred with his father and his brother, Libnan's boarding pass was marked with the now-familiar "SSSS."

119. Libnan was held at O'Hare and not allowed to board his flight.

120. Eventually, Libnan boarded his domestic flight from O'Hare to Tucson and made it home.

121. Almost a year later, on June 29, 2024, Libnan was returning to Tucson from Spain. His itinerary had him arriving to Dallas before connecting to Tucson.

122. Upon arriving to the Dallas International Airport, Libnan had his passport scanned at an electronic kiosk. On the screen of the kiosk, he observed a red "X" indicating that he could not pass.

123.     Libnan was then ushered to an interrogation room where his backpack was emptied and his personal devices confiscated.

124.     While in the interrogation room of the Dallas airport, Libnan was confronted with a line of questioning regarding his father's international business relationships and travels.

125.     Upon information and belief, Libnan's treatment is related to his familial relationship to his father.

## CLAIMS

## COUNT I

**Failure to Provide Post-Deprivation Notice and Hearing in Violation of the Fifth Amendment Due Process Clause
(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

126.     Each Plaintiff has learned that he has been placed on some type of government watchlist. Each Plaintiff has strong reason to believe that he has been placed specifically on the government's so-called Selectee List.

127.     Plaintiffs undoubtedly have a strong liberty interest in domestic and international travel. Where the government interferes with a person's ability to cross an international border by any means, the liberty interest is even stronger than when government interferes with only one avenues or method of traveling.

128.     Defendants' actions in refusing to provide Plaintiffs with the reasons or bases for their placement on a government watchlist and in refusing to provide Plaintiffs with a

meaningful opportunity to challenge their continued inclusion on such list deprive Plaintiffs of constitutionally protected liberty interests.

129.     Plaintiffs, having sought to challenge their placement on the government watchlist, are entitled to a constitutionally adequate legal mechanism that affords them notice of the reasons and bases for their placement on such list, and a meaningful opportunity to contest their continued inclusion on it.

130.     By failing to provide Plaintiffs with such a constitutionally adequate legal mechanism, Defendants have deprived Plaintiffs of their protected liberty interests, including but not limited to their liberty interests in traveling, freedom from false stigmatization, and thus have violated Plaintiffs' constitutional rights without affording them due process of law and will continue to do so into the future if Plaintiffs are not afforded the relief demanded below.

131.     The Government's designated mechanism – TRIPS – fails to meet the minimum Due Process requirements of *Mathews v. Edridge*, as applied to each of them individually. For example, Ali has not even been notified whether his name appears on any government watchlist in the first instance, despite all extrinsic evidence indicates that he is on such a list. In this sense, even the first (and most basic) of the requirements prescribed by *Mathews v. Eldridge* has not been met: adequate notice.

132.     Even if the government were to definitively notify Ali that his name appears on the Selectee List, the TRIPS program does not allow Ali to hold an adversarial hearing, does not allow him a neutral decisionmaker such as that typically afforded in situations

where an administrative law judge (ALJ) is present, and does not allow him to subpoena witnesses or documents.

133.    Libnan and Daniel are in a similar position: they have not been given even rudimentary notice of the category into which they have almost certainly been lumped by their government.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court grant him the following relief:

A. Declare that Defendants have violated Plaintiffs' rights under the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

B. Enter an injunction:

   a. enjoining Defendants from arresting, seizing, searching, or interrogating Plaintiffs because of their placement on a terrorism-related watchlist;

   b. enjoining Defendants from arresting, seizing, detaining, searching, or interrogating Plaintiffs Daniel Jiha and Libnan Jiha because of their association with Ali Jiha;

   c. requiring Defendants to provide Plaintiffs with notice of the reasons for their placement on a watchlist and a meaningful opportunity to contest their continued retention on it;

   d. requiring Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any and all terrorist-related watchlists associated with the TSDB;

   e. requiring Defendants to expunge from government databases or otherwise destroy all information unlawfully obtained from Plaintiffs at land ports of entry and international airport terminals;

f. grant Plaintiffs Global Entry Identification (ie, Sentri Pass), allowing them to enter the United States at designated ports of entry, with reduced screening.

C. Reasonable attorney fees under 42 U.S.C. § 1988;

D. Costs of this action;

E. Any other relief that this Court deems appropriate.

Respectfully submitted this 12th day of September, 2025 by:

/s Paul Gattone
Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
Email: GattoneCivilRightsLaw@gmail.com
(520) 623-1922
*Attorney for Plaintiff Ali Jiha, Daniel Jiha, and Libnan Jiha*